412 F.Supp. 904 (1976)
In re Grand Jury Investigation, Americo BUONACOURE, a witness.
UNITED STATES of America ex rel., GRAND JURY INVESTIGATION,
v.
Americo BUONACURE, a witness.
Misc. No. 75-84, Civ. A. No. 75-3472.
United States District Court, E. D. Pennsylvania, Civil Division.
March 18, 1976.
*905 Joseph C. Santaguida, Jacob Kossman, Philadelphia, Pa., for petitioner.
Donald F. Manno, Sp. Atty., U. S. Dept. of Justice, Robert E. J. Curran, U. S. Atty., E. D. Pa., Philadelphia, Pa., for respondent.

OPINION
DITTER, District Judge.
This case involves an immunized witness who was jailed for contempt and subsequently indicted for activities related to those about which he refused to testify.[1] He has petitioned the court for release from incarceration or, in the alternative, to have the indictment dismissed. I conclude that he is not entitled to either remedy, and therefore relief must be denied.
On March 24, 1975, petitioner Americo Buonacuore was called before the grand jury sitting on Mondays in this district to testify about organized gambling activities which possibly constituted violations of 18 U.S.C. §§ 1955 and 371.[2] Invoking his Fifth Amendment privilege against self-incrimination, Buonacuore refused to provide any information. The Government thereafter moved, pursuant to 18 U.S.C. § 6001 et seq., for an order of immunization compelling his testimony. Buonacuore countered with a petition to quash his grand jury subpoena and to deny immunization. Following a hearing, I granted the Government's motion and refused Buonacuore's. He thereafter persisted in his refusal to answer questions propounded to him before the grand jury, and the Government moved for a contempt *906 citation.[3] After several hearings, at which considerable testimony relating to Buonacuore's health was received, on September 4, 1975, I found him to be in civil contempt,[4] and directed that he be committed to the custody of the Attorney General. On November 19, 1975, a different grand jury than that before which Buonacuore had been summoned to appear[5] returned a two-count indictment charging him and five other individuals with violations of 18 U.S.C. §§ 1955 and 371.[6]
Two petitions now are before the court.[7] Although seeking essentially identical relief, namely Buonacuore's release from custody, they are premised upon dramatically different claims. In the first, a habeas corpus petition, Buonacuore alleges that he is being held unlawfully because his "medical condition is such that his life is endangered by being in custody." The thrust of his second petition for release is that "where a defendant faces trial on an indictment and has not been given transactional immunity, he cannot be called as a witness before a Grand Jury and held in contempt for failure to testify."[8] Accordingly, he posits that either his indictment must be dismissed, a remedy which lies properly within the province of Judge Green, see note 6 supra, or he must be released from custody.
I need not tarry long on Buonacuore's habeas petition  it seeks release on grounds which I carefully considered and rejected prior to ordering his incarceration in the first place, i. e., his health. Before holding Buonacuore in contempt, I received evidence at length about his gall bladder surgery and alleged coronary problems. Disposition of the Government's motion was delayed until I was satisfied that recuperation following the surgery was complete and that incarceration would not endanger him. Nevertheless, as soon as he was ordered to prison, Buonacuore's complaints about his health accelerated in what I believe was a contrived campaign to regain his freedom. No objective evidence of any coronary difficulty was reported to me, but the nature of Buonacuore's symptomatology, though only subjective, made special examination and precautions necessary. Finally, I suggested that he be sent to the Medical Center for Federal Prisoners, Springfield, Missouri, where a full range of *907 diagnostic and treatment services are available. He remains there at this time.[9]
Federal law, 28 U.S.C. § 1826, plainly contemplates a relatively broad latitude in which a district judge may exercise his discretion in deciding whether to incarcerate a recalcitrant witness. Here, because of the demonstrated need for Buonacuore's testimony, his refusal to testify in the face of a grant of immunity, and my conviction that whatever medical problems he might have could more than adequately be dealt with in the medical facilities in which I could direct that he be incarcerated, I opted to order his confinement. Under such circumstances, my decision did not constitute an abuse of discretion and the habeas petition raises no new question in this regard.
Central to the resolution of petitioner's other claim  i. e., that he cannot remain jailed for contempt while under indictment for the activities about which he refused to testify  is a proper appreciation of the distinction between use immunity and transactional immunity. The former, of course, immunizes a witness against the use of his compelled testimony and evidence derived therefrom, while the latter precludes prosecution for offenses to which such testimony relates. Kastigar v. United States, 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212, 215 reh. denied, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972). In Kastigar, the Supreme Court held that use and derivative use immunity as provided by 18 U.S.C. § 6002 are substantially co-extensive with the scope of the privilege against compulsory self-incrimination embodied in the Fifth Amendment, and as such are sufficient to compel testimony over a claim of privilege. Id. at 453, 92 S.Ct. at 1661, 32 L.Ed.2d at 221.[10] Transactional immunity, on the other hand, the Court reasoned, affords broader protection than the Fifth Amendment and is not constitutionally required. Id.[11] An individual accorded use immunity "is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities," since the statute imposes upon the prosecution the affirmative duty to prove that any evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. Id. at 460, 92 S.Ct. at 1665, 32 L.Ed.2d at 226.[12]
Here not only was the indictment against Buonacuore obviously based upon *908 evidence derived from sources wholly independent of anything he said  since he said nothing  but it was returned by a different grand jury than that before which he was contumacious. Neither prior nor subsequent to his indictment has he been called to testify before the grand jury which indicted him. No possibility exists, therefore, that the grand jury which indicted Buonacuore might in any way have been prejudiced by his refusal to testify. Indeed in Beverly v. United States, 468 F.2d 732, 743 (5th Cir. 1972), it was held that where a grand jury returned an indictment naming two witnesses as co-conspirators subsequent to their refusal to testify, post-indictment questioning of those individuals before the same grand jury with a view toward discovery of alleged "unknown persons" did not constitute an improper use of the grand jury for discovery purposes, notwithstanding the fact that identical questions were posed on both occasions.
Here, should petitioner even at this late date elect to purge himself of the contempt, under the teaching of Kastigar, the Government would have to prove in any subsequent criminal proceeding, including the one he presently faces, that any evidence it seeks to introduce was neither directly nor indirectly a product of his grand jury testimony.[13] To decide, as petitioner would have me do, that he cannot be held as a contemnor while under indictment for the activities about which he will not testify, would all but render the concept of use immunity a nullity. Such a holding would require the Government either to grant a witness transactional immunity, which was held in Kastigar not to be constitutionally mandated, and thus allow him to elude conviction on the basis of evidence derived from a legitimate source wholly independent of his compelled testimony, or to indict him and forfeit the right to valuable knowledge he may possess concerning individuals and conduct within the scope of a grand jury's investigation. Neither the Constitution nor the law as enacted by Congress and interpreted by the courts, demands that a prosecutor make such a distasteful election. The compromise embodied in Section 6002 is fully adequate to protect Buonacuore's rights.
In support of his request for relief, Buonacuore points out that in Testa v. United States, 379 U.S. 843, 85 S.Ct. 83, 13 L.Ed.2d 49 (1964), and Pappadio v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), the Government voluntarily dismissed pending indictments rather than discharge from custody witnesses being held in civil contempt. On the basis of these cases, Buonacuore apparently theorizes that the Government would have to dismiss the indictment against him if he now chose to testify. Since the indictment has not been dismissed, he reasons that his refusal to testify is justified and cannot support a contempt citation. Whatever the validity of his first premise may be,[14] his second in no fashion flows so smoothly from it. The possibility that the Government might have to drop its charges against him does not at all admit the propriety of his unwillingness to testify. On the contrary, his theory is viable if and only if he decides to purge himself of contempt. As long as he persists in refusing to answer questions before the grand jury, his arguments as to what should happen if he did so are premature.
Petitioner's reliance upon Judge VanArtsdalen's decision in In re Grand Jury Proceedings (Vito N. Pisciotta), (E.D.Pa., filed Jan. 20, 1976), is misplaced. There the Government proposed to elicit the testimony of a witness, under a grant of immunity if necessary, relating to the subject matter *909 of an indictment upon which he had been convicted. In characterizing the double-edged sword facing the witness there, Judge VanArtsdalen said:
If, after a grant of immunity he refuses to testify, contempt proceedings will be initiated. If he testifies in a manner that would exculpate him as to the offenses of which he stands convicted, the government confirms that it would proceed to prosecute him for perjury, based on the testimony of the witnesses and the evidence presented against him in the trial. If he inculpates himself and Sills, the government will call petitioner as a witness in the Sills trial. Thus the government will be able to utilize the grand jury proceedings as a "dress rehearsal" for possible trial testimony of petitioner against Sills. Finally, if petitioner's present conviction is ever set aside or invalidated, either by the trial judge or an appellate court, and a retrial is ordered, petitioner would be faced with his grand jury testimony in the event he wanted to testify in his own behalf [emphasis added].[15]
Quite clearly, Judge VanArtsdalen's rationale for quashing the subpoena in Pisciotta was the prevention of abuse of the grand jury by the Government. See, e. g., United States v. Dionisio, 410 U.S. 1, 12, 93 S.Ct. 764, 770, 35 L.Ed.2d 67, 78 (1973), citing Branzburg v. Hayes, 408 U.S. 665, 707-08, 92 S.Ct. 2646, 2669-70, 33 L.Ed.2d 626, 654 (1972); In re Grand Jury Proceedings (Schofield I), 486 F.2d 85, 91 (3d Cir. 1973); Beverly v. United States, supra, 468 F.2d at 743. By contrast, in the matter sub judice, no evidence of any improper motive on the part of the Government is apparent. To the contrary, since the outset of the proceedings before me, the Government's stance has been that Buonacuore possesses information which "may be necessary to the public interest" and that his testimony is of potentially sufficient value to justify a grant of immunity pursuant to Section 6002.[16] Petitioner has proffered no evidence that he was indicted as a means of harassment or for any other impermissible purpose. On the facts here presented, I find no basis for concluding that the Government has attempted to abuse the grand jury.
Piemonte v. United States, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961), and In re Liddy, 165 U.S.App.D.C. 254, 506 F.2d 1293 (1974), equally are of no avail to petitioner. The Supreme Court in Piemonte upheld a contempt conviction where the contemnor after imposition of sentence was indicted by the same grand jury before which he had refused to testify.[17] And in Liddy the court merely questioned, by way of dicta, the propriety of calling a witness facing trial to testify before the same grand jury which indicted him. 165 U.S. App.D.C. at 260, 506 F.2d at 1299-1300; but see Beverly v. United States, supra. Inasmuch as petitioner has never been called to testify before the indicting grand jury, I need not reach the question adverted to in Liddy.
For the foregoing reasons, then, Buonacuore's second petition for release from custody in Misc. No. 75-84 and his petition for a writ of habeas corpus in Civil No. 75-3472 will be denied.
NOTES
[1] The spelling of petitioner's last name has not been uniform throughout these proceedings. The spellings in the captions are those of the first document filed in each action and adopted by the clerk of court. Inasmuch as petitioner himself signed his name "Buonacuore" on his pro se petition in Civil Action No. 75-3472, that spelling is used in the course of this opinion.
[2] Section 1955 prohibits participation in any "illegal gambling business," and under Section 371 it is unlawful for two or more persons to conspire to commit any offense against the United States.
[3] Petitioner at that point renewed his motion to quash his subpoena, this time on the ground that Donald F. Manno, Esquire, a special attorney with the organized crime and racketeering section of the criminal division of the United States Department of Justice, was not properly authorized to represent the Government when he was first called before the grand jury. For the reasons set forth in United States v. Brown, 389 F.Supp. 959 (S.D.N.Y.1975), I again denied the motion to quash. See In re Subpoena of Persico, 522 F.2d 41, 56-64 (2d Cir. 1975), and cases cited therein.
[4] See 28 U.S.C. § 1826.
[5] The grand jury which meets on Wednesdays indicted Buonacuore, while the one before which he was contumacious meets on Mondays.

For a comprehensive portrayal and critique of the grand jury system in this district, see Hawthorne v. Director of Internal Revenue, 406 F.Supp. 1098 (E.D.Pa., filed November 11, 1975).
[6] Criminal Action No. 75-711 (E.D.Pa.). That matter has been assigned to my colleague, the Honorable Clifford Scott Green.
[7] Although styled as distinct actions, the same set of facts forms the backdrop for both Misc. No. 75-84 (E.D.Pa.) and Civil Action No. 75-3472 (E.D.Pa.). In the former, the original contempt proceeding, subsequent to his incarceration, Buonacuore has filed two petitions for release from custody. I denied the first on January 5, 1976; the second is the subject of this opinion. In Civil Action No. 75-3472, Buonacuore has petitioned this court pro se for a writ of habeas corpus. That petition also will be disposed of in the course of this opinion.
[8] Memorandum of Law accompanying Defendant's Second Petition for Discharge from Custody 2.

Although substantially the same argument was advanced in Buonacuore's initial petition for release, which I denied on January 5, 1976, his retention of new counsel and the arguable relevance of Judge VanArtsdalen's decision in In re Grand Jury Proceedings (Vito N. Pisciotta), Misc. No. 75-382 (E.D.Pa., filed Jan. 20, 1976), persuaded me to entertain the second petition.
[9] Petitioner contends that his being held in Missouri inhibits his ability to consult with his attorney and thereby prepare for trial. Although direct attorney-client consultation is made less convenient by Buonacuore's confinement in Springfield, I find this insufficient to warrant his release. Inasmuch as the federal medical facility was designated as petitioner's place of incarceration because of his claim of ill health, should he now abandon that claim, and if his physicians approve, he could probably be brought back to this area. He will, of course, be able to consult with his attorney at length when he is returned here for trial, and until that time counsel can travel to Springfield if he deems in-person conferences essential. Finally, any claim of insufficient time for preparation may be addressed to Judge Green prior to commencement of trial (see note 6 supra).
[10] See also Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); In re Liddy, 165 U.S.App.D.C. 254, 506 F.2d 1293 (1975); In re Viti, 460 F.2d 1269 (2d Cir. 1972); Kronick v. United States, 343 F.2d 436 (9th Cir. 1965).
[11] A grant of immunity broader than the Fifth Amendment's privilege against self-incrimination would infringe "upon both the great common law principle that `the public has a right to every man's evidence,' and the duty to testify `recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor,'" United States v. DeDiego, 167 U.S.App.D.C. 252, 256, 511 F.2d 818, 822 (1975), quoting Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Such immunity might also infringe upon the right of another sovereignty, whether the federal government or a state, to enforce its laws. United States v. DeDiego, supra, 167 U.S.App.D.C. at 256, 511 F.2d at 822.
[12] See also Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678, 695 (1964).
[13] In its answer to Buonacuore's first petition for release, the Government averred that court-authorized electronic surveillance conducted in November, 1974  and terminated more than three months before he was called to testify  provided ample evidence to secure convictions for the offenses with which he stands charged.
[14] Although indictments in those cases may well have been voluntarily dismissed by the Government, nothing in the denial of certiorari in Testa or the Court's and Mr. Justice Harlan's concurring and dissenting opinions in Pappadio even mention such dismissals, let alone suggest that they were required as a matter of law.
[15] In light of the language of Section 6002 and the holdings of such cases as Kastigar, supra, and Murphy, supra, I am uncertain whether this conclusion inescapably follows. But cf. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970).
[16] Indeed, the Government appears in all respects to have attempted to employ Section 6002 precisely as Congress intended, i. e., to obtain the testimony of "agents" involved in a crime in order to discover and prosecute the "principal." See In re Liddy, 165 U.S.App.D.C. 254, 266, 506 F.2d 1293, 1305 (1974); Goldberg v. United States, 472 F.2d 513, 515 (2d Cir. 1973), citing Hearings on H.R. 11157 and H.R. 12041 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 91st Cong., 1st Sess. 42 (1970).
[17] The indictment concededly was dismissed for lack of evidence on the motion of the Government after the Supreme Court granted certiorari but prior to that tribunal's decision. Piemonte v. United States, 367 U.S. 556, 566, 81 S.Ct. 1720, 1726, 6 L.Ed.2d 1028, 1035 (Douglas, J., dissenting).